DISCIPLINARY COUNSEL *v.* ULINSKI.

[Cite as *Disciplinary Counsel v. Ulinski,*
106 Ohio St.3d 53, 2005-Ohio-3673.]

(No. 2004–2115—Submitted February 16, 2005—Decided August 3, 2005.)

**Per Curiam.**

{¶ 1} Respondent, Christopher Karl Ulinski of Akron, Ohio, Attorney Registration No. 0046731, was admitted to the Ohio bar in 1990. On November 21, 2003, we suspended respondent from the practice of law on an interim basis pursuant to Gov.Bar R. V(5)(A)(4) upon notice that he had been convicted of a felony. See *In re Ulinski,* 100 Ohio St.3d 1490, 2003-Ohio-6184, 799 N.E.2d 173.

{¶ 2} On February 5, 2004, relator, Disciplinary Counsel, charged respondent with violations of the Code of Professional Responsibility. A panel of the Board of Commissioners on Grievances and Discipline heard the cause and, based on comprehensive stipulations, made findings of fact, conclusions of law, and a recommendation, all of which the board adopted.

## Misconduct

{¶ 3} On July 31, 2003, respondent pleaded guilty to conspiracy to commit securities fraud, mail fraud, and wire fraud in violation of Section 371, Title 18, U.S.Code. He was sentenced to probation for a term of two years and ordered to participate in home confinement with electronic monitoring for six months. Respondent was also ordered to pay $137,511.50 in restitution, although this requirement was not made a condition of his probation.

{¶ 4} Respondent's conviction followed his affiliation in 1992 with Andrew P. Bodnar, whom we disbarred for financial misdealing in *Akron Bar Assn. v. Bodnar* (2000), 90 Ohio St.3d 399, 739 N.E.2d 297. In 1992, however, Bodnar was a practicing lawyer, securities salesman, financial planner, and tax preparer. Gregory J. Best, a broker-dealer registered with the United States Securities and

Exchange Commission, sold securities in Akron from 1992 through 1997, and in 1998, he bought and took over part of Bodnar's operation.

{¶ 5} The parties stipulated that Bodnar, Best, and Ulinski engaged in activities from 1994 through April 1998 that led to Bodnar's and Best's indictment and to the information in which respondent was charged. According to the stipulations, the group conspired through a Ponzi scheme to defraud investors in Ohio and other states. A Ponzi scheme is perpetrated with fabricated investment deals in which investors are paid not with actual dividends and principal, but with money on loan from another source, usually new investors. See *Cunningham v. Brown* (1924), 265 U.S. 1, 7–9, 44 S.Ct. 424–425, 68 L.Ed. 873, for a discussion of the original Ponzi swindle.

{¶ 6} Bodnar organized and presented seminars on estate planning to attract potential investors. Ulinski assisted with the seminars and provided legal counsel, including the preparation of trusts, to interested attendees. Through their attorney-client relationships and services, Bodnar and Ulinski learned the extent and nature of unsuspecting clients' assets. Afterward, Bodnar, Best, and agents other than respondent approached the seminar clients and persuaded them to invest in their fraudulent scheme, which eventually approached or exceeded $41 million. The parties stipulated to some details of this scheme:

{¶ 7} "The investments consisted of the following: (1) QuickStart Promissory Notes, supposedly to make bridge loans to QuickStart; (2) International Aerotech Promissory Notes, supposedly to make bridge loans to International Aerotech; (3) CBT and related entities; (4) ["The London Deal"]; and, (5) Hamilton–Larking, LLC and Laurex bridge loans.

{¶ 8} "From 1995 through 1998, Bodnar and Best * * * sold so-called 'bridge loan' investments, which they purported would use investors' funds in order to form a pool of funds which would be advanced to various and mostly well-known companies, as [supposed] short-term loans. [Bodnar and Best] represented that payment of high interest rates would be made, and promissory notes were signed by investors, with Bodnar and Best representing that investments would be repaid with significant interest, usually within 30 to 90 days. Bodnar and Best would represent that the investments were safe and secure, because there were stocks which would be used as collateral to protect the investments.

{¶ 9} "In truth, Bodnar and Best knew, and, at some point, Ulinski knew there was a Ponzi scheme, and that investors were paid monies received from other bridge loan investors, done in a manner to conceal the fraudulent nature, and to lull investors into a false sense of security, so as to quiet any complaining investors, and to keep them from complaining to law enforcement authorities, and to induce investors to keep their princip[al] invested, and to have them increase investments. In fact, there was no collateral securing any of these investments,

except QuickStart Technologies, which was purportedly secured by QuickStart stock, purchased by Bodnar in his name, but purchased with investors' money. Additionally, Bodnar and Best, and ultimately Ulinski, knew that, even this so-called collateral was grossly insufficient.

{¶ 10} "Bank accounts at Key Bank were opened with Ulinski listed as the escrow agent, causing a false impression to investors that Ulinski was acting as a fiduciary who was protecting the interests of the investors. On February 13, 1995, Ulinski began issuing large checks to Bodnar out of Ulinski's Interest on Lawyers' Trust Accounts ("IOLTA") account with Key Bank, into which Ulinski had deposited large amounts of investors' funds, as escrow agent and fiduciary for said investors' funds. A February 13, 1995 Ulinski check, payable to Bodnar for $50,000.00, was identified as 'QuickStart overage,' but the source of the check was entirely from investor funds. Additional checks were written from February 16, 1995 through December 31, 1997, with the source for all these checks coming from investors' deposits, in violation of a fiduciary duty, all of which aided Bodnar in perpetrating the Ponzi scheme.

{¶ 11} "Ulinski also drafted a number of legal documents, including promissory notes and bridge loan agreements, which he knew [at some time] to be false and fictitious, and which were intended to be provided to investors by Bodnar and Best, and other securities salesmen and other co-conspirators.

{¶ 12} "On a few occasions, Ulinski engaged in a fee-splitting arrangement with Best and other salesmen, wherein he would split a portion of his legal fees in return for their referral of their securities customers. On some occasions, Best also paid a portion of his fees to the [respondent], Ulinski, in return for his referral of legal clients."

{¶ 13} The parties stipulated and the board found that respondent's involvement in this fraudulent investment scheme had violated DR 1–102(A)(3) (barring illegal conduct involving moral turpitude), 1–102(A)(4) (barring conduct involving fraud, deceit, dishonesty, or misrepresentation), 1–102(A)(6) (barring conduct that adversely reflects on a lawyer's fitness to practice law), 5–l0l(A)(1) (barring a lawyer, except with a client's consent after full disclosure, from accepting employment where the lawyer's conflicting interests may reasonably affect the lawyer's judgment on the client's behalf), and 9–102(A) (requiring a lawyer to maintain client funds in a separate, identifiable bank account).

## Sanction

{¶ 14} In recommending a sanction for this misconduct, the board considered the mitigating and aggravating factors of respondent's case. See Section 10 of the Rules and Regulations Governing Procedure on Complaints and Hearings before the Board of Commissioners on Grievances and Discipline ("BCGD

Proc.Reg."). The board found that respondent had no prior disciplinary record and had cooperated completely with relator and federal authorities, his assistance to the United States Attorney having been instrumental in the convictions of nine codefendants. BCGD Proc.Reg. 10(B)(2)(a) and (d). The board further found that respondent had complied with the terms of his probation and interim suspension. Respondent also reported his felony conviction to this court and stopped practicing law even before his interim suspension. Since his suspension, respondent has worked for his wife, another attorney, preparing tax returns, and as of the hearing date, he had paid $2,128 in restitution, approximately ten percent of his gross salary, in a good faith effort to comply with the federal sentencing order.

{¶ 15} Before the panel, respondent explained that he had not realized at first that he was defrauding investors and acting illegally by facilitating Bodnar's and Best's machinations. He lamented his inexperience in securities law and conceded that he should have recognized the fraudulent scheme sooner, but he "looked away" from his ethical obligations and trusted in his associates. Respondent insisted that he had never intended to mislead investors but still accepted full responsibility for his misconduct.

{¶ 16} The board was impressed with respondent's testimony and remorse for his misconduct. The board was also impressed by the testimony and many letters extolling respondent's competence and character apart from his involvement with Bodnar and Best. These supporters related that respondent was dedicated to his family, church, and community, regularly volunteering on a personal and professional basis in a wide variety of ways. Many supporters also insisted that respondent's crimes were completely out of character because he was known in the legal community for his honesty, conscientiousness, and genuine concern for his clients.

{¶ 17} The parties jointly recommended that respondent's license to practice be indefinitely suspended, with his reinstatement to be conditioned on full compliance with the terms of his federal probation. Respondent additionally requested that he be credited for the time served since the interim suspension of his license. Adopting the panel's recommendation, the board recommended that respondent be indefinitely suspended from the practice of law, and, based on the strength of his mitigation evidence, that he be given credit for the time served from the date of his November 21, 2003 interim suspension.

{¶ 18} Upon review, we agree that respondent violated DR 1–102(A)(3), 1–102(A)(4), 1–102(A)(6), 5–101(A)(1), and 9–102(A), as found by the board. We find the recommended indefinite suspension, however, far too lenient for misconduct of this magnitude.

{¶ 19} "A lawyer is prohibited by the Disciplinary Rules from participating in fraudulent or dishonest schemes." *Disciplinary Counsel v. Dukat* (1997), 79 Ohio St.3d 189, 190, 680 N.E.2d 972. Thus, in *Disciplinary Counsel v. Bein,* 105 Ohio St.3d 62, 2004-Ohio-7012, 822 N.E.2d 358, we disbarred a lawyer who knowingly conspired with others in an illegal commercial enterprise involving the interstate transportation and sale of stolen property. And even though the lawyer in *Disciplinary Counsel v. Williams* (1993), 66 Ohio St.3d 71, 609 N.E.2d 149, cooperated with authorities and was considered the least culpable codefendant, we disbarred him for knowingly conspiring to launder proceeds from illegal drug sales.

{¶ 20} In imposing our most severe sanction, we admonished in *Bein*:

{¶ 21} "A lawyer who engages in the kind of criminal conduct committed by respondent violates the duty to maintain personal honesty and integrity, which is one of the most basic professional obligations owed by lawyers to the public. Respondent's misconduct was harmful not only to the businesses affected but also to the legal profession, which is and ought to be a high calling dedicated to the service of clients and the public good." Id., 105 Ohio St.3d 62, 2004-Ohio-7012, 822 N.E.2d 358, ¶ 13.

{¶ 22} Respondent claims that he initially executed his fiduciary duties overseeing the escrow account and the funds held in his client trust account without realizing any impropriety. But as early as February 1995, respondent knew that there were "problems" with paying off promissory notes and did nothing to protect his clients' or investors' interests. Not until the fall of 1997 did respondent finally conclude that the collateral in escrow had become grossly insufficient and that Bodnar and his agents were duping more and more investors by misrepresenting the security of their loans.

{¶ 23} In addition to the lawyer's mental state, the ethical duties that he or she violated, and attendant mitigating or aggravating circumstances, we consider the injury caused by the professional misconduct in determining the appropriate sanction. *Cleveland Bar Assn. v. Glatki* (2000), 88 Ohio St.3d 381, 384, 726 N.E.2d 993. Here, the effect was devastating. The investment scam in which respondent participated eventually affected $41 million in investor funds. Respondent acknowledged the "overwhelming" number of injured investors, estimating that approximately 100 of his own clients may have been victimized. Moreover, at the time he began cooperating with the United States Attorney's Office, respondent estimated that he was holding $3 to $5 million of investors' money without sufficient security.

{¶ 24} Respondent's cooperation, contrition, character evidence, lack of a prior disciplinary record, and attempt at restitution do little to counterbalance the financial havoc he helped to cause for so many clients and others. The public's

protection requires our most rigorous sanction. Respondent is therefore permanently disbarred. Costs are taxed to respondent.

Judgment accordingly.

MOYER, C.J., RESNICK, PFEIFER, LUNDBERG STRATTON, O'CONNOR, O'DONNELL and LANZINGER, JJ., concur.

———————

Jonathan E. Coughlan, Disciplinary Counsel, and Stacy Solochek Beckman, Assistant Disciplinary Counsel, for relator.

Law Offices of Charles W. Kettlewell and Charles W. Kettlewell, for respondent.