TOLEDO BAR ASSOCIATION *v.* RITSON.

[Cite as *Toledo Bar Assn. v. Ritson*, 127 Ohio St.3d 89, 2010-Ohio-4504.]

*Attorney misconduct — Conspiracy to commit mail fraud and wire fraud — Disbarment.*

(No. 2010-0341 — Submitted June 9, 2010 — Decided September 29, 2010.)

ON CERTIFIED REPORT by the Board of Commissioners on Grievances and Discipline of the Supreme Court, No. 09-027.

_____

**Per Curiam**.

{¶ 1} Respondent, Douglas John Ritson of Toledo, Ohio, Attorney Registration No. 0060104, was admitted to the practice of law in Ohio in 1992. In December 2006, respondent pleaded guilty to one count of conspiracy to commit mail fraud and wire fraud in violation of Section 371, Title 18, U.S.Code, in the United States District Court for the Northern District of Ohio, Western Division. In January 2007, he placed his license to practice law on inactive status pending the imposition of his federal sentence. Following his October 2008 sentencing hearing, we imposed an interim felony suspension on respondent's license and referred the matter to relator, Toledo Bar Association, for a disciplinary investigation. 120 Ohio St.3d 1429, 2008-Ohio-6274, 897 N.E.2d 661.

{¶ 2} A panel of the Board of Commissioners on Grievances and Discipline has recommended that respondent be indefinitely suspended for his participation in a criminal conspiracy to induce real estate agents and appraisers to join two professional organizations with the false promise that their membership dues would entitle them to errors-and-omissions insurance coverage. The board recommends that respondent be permanently disbarred from the practice of law in

Ohio. Respondent objects to the recommended sanction, arguing that the board failed to consider substantial mitigating evidence.

{¶ 3} For the reasons that follow, we overrule respondent's objection and adopt the board's findings of fact and conclusions of law and its recommendation to permanently disbar respondent from the practice of law in Ohio.

**Misconduct**

{¶ 4} The parties stipulated that from 1997 to 2001 respondent induced real estate agents and appraisers to purchase membership in the American Real Estate Association ("AREA") and the Noble Group ("Noble") on the false representation that as a benefit of membership, they would receive errors-and-omissions insurance coverage from Midwest Insurance Company ("Midwest"). However, Midwest, an offshore entity formed by one of respondent's coconspirators, was never licensed to provide insurance in the United States, and the promised errors-and-omissions policies never existed.

{¶ 5} In furtherance of this fraud, respondent mailed or faxed certificates of membership and certificates of insurance stating that members were covered by an errors-and-omissions insurance policy issued by Midwest and sent members a monthly newsletter that occasionally identified Midwest as the provider of the promised errors-and-omissions coverage. Respondent held himself out as a claims administrator and handled members' claims for coverage under the nonexistent insurance policies. He paid members' claims for attorney fees and settlements in installments, using dues and fees paid by AREA and Noble members.

{¶ 6} Respondent voluntarily stopped participating in the criminal enterprise on May 31, 2001. In November 2006, the United States attorney filed an information against respondent alleging one count of conspiracy to commit mail fraud and wire fraud in violation of Section 371, Title 18, U.S.Code. Pursuant to a plea agreement, respondent entered a guilty plea in December 2006,

and in October 2008, respondent was sentenced to one year and one day in federal prison and three years of supervised release, and was ordered to pay $3.7 million in restitution. The parties stipulate that the $3.7 million in court-ordered restitution represents dues and fees paid by AREA and Noble members from June 1997 through December 2001—money that they would not have paid without the promise of errors-and-omissions insurance.

{¶ 7} The panel and board adopted these stipulated facts and the parties' conclusion that respondent's conduct violated DR 1-102(A)(4) (prohibiting a lawyer from engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation) and 1-102(A)(6) (prohibiting a lawyer from engaging in conduct that adversely reflects on the lawyer's fitness to practice law). So do we.

**Aggravating and Mitigating Factors and Recommended Sanction**

{¶ 8} In recommending a sanction, the board considered the ethical duties that respondent violated, the aggravating and mitigating factors listed in Section 10 of the Rules and Regulations Governing Procedure on Complaints and Hearings Before the Board of Commissioners on Grievances and Discipline ("BCGD Proc.Reg."), and the sanctions imposed in similar cases. See, e.g., *Stark Cty. Bar Assn. v. Buttacavoli*, 96 Ohio St.3d 424, 2002-Ohio-4743, 775 N.E.2d 818, ¶ 16; *Disciplinary Counsel v. Broeren,* 115 Ohio St.3d 473, 2007-Ohio-5251, 875 N.E.2d 935, ¶ 21.

{¶ 9} As aggravating factors, the parties stipulated and both the panel and board found that respondent had previously been publicly reprimanded in *Toledo Bar Assn. v. Ritson*, 94 Ohio St.3d 411, 2002-Ohio-1047, 763 N.E.2d 591, for filing an action without the knowledge or consent of the party he claimed to represent. See BCGD Proc.Reg. 10(B)(1)(a). In this case, respondent's conduct involved dishonesty and a selfish motive and a pattern of misconduct involving multiple offenses over a period of four and one-half years. See BCGD Proc.Reg. 10(B)(1)(b), (c), and (d). His conduct caused $3.7 million in losses to his victims,

which has not been repaid, despite a federal restitution order. See BCGD Proc.Reg. 10(B)(1)(h).

{¶ 10} As mitigating factors, the parties stipulated that respondent cooperated in the disciplinary process as well as in the federal investigation and prosecution of his coconspirators and that he voluntarily stopped participating in the criminal enterprise on May 31, 2001. The panel and board, however, expressly refused to consider respondent's voluntary abandonment of the conspiracy as mitigating, because respondent knew that the operation continued after his departure and failed to report the criminal activity.

{¶ 11} Relator asked the panel to impose an indefinite suspension even though relator acknowledged the factual similarities between this case and the case of *Disciplinary Counsel v. Ulinski*, 106 Ohio St.3d 53, 2005-Ohio-3673, 831 N.E.2d 425. In *Ulinski,* we rejected the recommended indefinite suspension and permanently disbarred an attorney for his participation in inducing people, including a number of his own clients, to invest approximately $41 million in what was actually a Ponzi scheme. Relator distinguished respondent's conduct by stating that respondent did not "set out to victimize clients" and that although he had prepared documents in furtherance of the criminal enterprise, "the documents were not themselves fraudulent."

{¶ 12} For his part, respondent argues that he should receive a sanction no greater than a two-year suspension, citing our decisions in *Disciplinary Counsel v. Margolis*, 114 Ohio St.3d 165, 2007-Ohio-3607, 870 N.E.2d 1158 (imposing a two-year suspension on an attorney convicted of federal antitrust violations that caused between $37.5 million and $100 million in damages), and *Disciplinary Counsel v. Blaszak*, 104 Ohio St.3d 330, 2004-Ohio-6593, 819 N.E.2d 689 (imposing a two-year suspension with credit for time served under an interim felony suspension on an attorney convicted of a felony for offering to sell truthful testimony in exchange for $500,000).

**{¶ 13}** Citing the similarities between this case and *Ulinski* and noting respondent's prior disciplinary sanction, the panel concluded that the proper sanction for respondent's misconduct is an indefinite suspension from the practice of law with no credit for his interim felony suspension. The board, however, recommends that we permanently disbar respondent, citing his lengthy involvement in criminal conduct that caused thousands of victims to suffer an aggregate loss of $3.7 million.

### Objection

**{¶ 14}** Respondent objects to the recommended sanction, claiming that it is too harsh because the board failed to consider significant mitigating evidence. Specifically, respondent contends that we should consider the following factors: (1) his good character and reputation, see BCGD Proc.Reg. 10(B)(2)(e), (2) his timely good-faith effort to make restitution and to rectify the consequences of his misconduct, see BCGD Proc.Reg. 10(B)(2)(c), (3) the absence of a dishonest or selfish motive, see BCGD Proc.Reg. 10(B)(2)(b), and (4) the imposition of other penalties or sanctions, see BCGD Proc.Reg. 10(B)(2)(f). He further asserts that his prior disciplinary record should not weigh heavily against him, because it involved only a public reprimand. In light of these facts and the sanctions imposed in *Margolis*, 114 Ohio St.3d 165, 2007-Ohio-3607, 870 N.E.2d 1158, and *Blaszak*, 104 Ohio St.3d 330, 2004-Ohio-6593, 819 N.E.2d 689, respondent asserts that an indefinite suspension is the appropriate sanction for his misconduct.

### Respondent's Character Evidence

**{¶ 15}** Respondent notes that he submitted several positive character-reference letters and testimony from three additional character witnesses at the panel hearing, and he challenges the panel's and the board's failure to recognize this evidence as mitigating. See BCGD Proc.Reg. 10(B)(2)(e). He suggests that this oversight may have been due to the fact that the transcript of the panel

hearing was not filed until three days after the board had considered the panel report.

{¶ 16} Gov.Bar R. V(6)(J) provides that the panel report "shall include the transcript of testimony taken." The Rules and Regulations Governing Procedure on Complaints and Hearings Before the Board of Commissioners on Grievances and Discipline ("BCGD Proc.Reg.") also contemplate that the transcript will be filed *before* the panel report, stating that "[t]he report of the panel * * * shall be submitted to the full Board within forty days of the filing of the transcript for consideration at the next regularly scheduled meeting of the Board," and that the report "should be submitted to the Secretary at least seven days prior to [the date of the board meeting]." BCGD Proc.Reg. 9(B)(1) and (2).

{¶ 17} Gov.Bar R. V(11)(D), however, states, "No investigation or procedure shall be held to be invalid by reason of any nonprejudicial irregularity or for any error not resulting in a miscarriage of justice." In this case, all the exhibits were either stipulated to before or submitted during the panel hearing. Thus, the panel members were aware of all the evidence before they prepared their report. And because panel members see and hear the witnesses firsthand, the board may rely upon the panel's assessment of witness credibility, unless other evidence weighs heavily against it. See *Cuyahoga Cty. Bar Assn. v. Leneghan*, 117 Ohio St.3d 103, 2008-Ohio-506, 881 N.E.2d 1241, ¶ 16-17. Moreover, the transcript was filed before the board prepared and issued its report, and it is part of the record now before this court. Therefore, any irregularity in the filing of the transcript has not caused any prejudice to respondent.

{¶ 18} In support of respondent's claims of good character and reputation, the panel heard the testimony of three character witnesses, all friends of respondent, and reviewed five letters from other friends and a family member. Each of the witnesses testified that respondent is honest and of good character, but their professional dealings with respondent were either limited or remote in time.

**{¶ 19}** The first witness, respondent's friend since high school, had "very, very limited" professional dealings with respondent. The second met respondent while exercising at a gym and testified that he had "bounced [business decisions] off him several times," and had even hired respondent to help run his 600-acre farm after respondent had served his criminal sentence. However, that witness admitted that respondent had never represented him in a legal matter.

**{¶ 20}** The third witness described respondent as his best friend. And although he and respondent had had a lot of work-related interaction in the past— as members of the armed forces, as bailiffs, and as judicial law clerks—he admitted that their current relationship is purely social and that the contact he had with respondent during the period of his misconduct was limited to social conversations, mainly by phone.

**{¶ 21}** Of the five character letters respondent submitted to the panel, one was written by respondent's live-in girlfriend and another by his brother-in-law, who is also a long-term client. Each of these letters spoke to respondent's trustworthiness and compassion. A friend and former coworker described respondent as "generous to a fault." And an attorney who shared office space with respondent from 1996 through 2003 (during respondent's misconduct and for two years thereafter), wrote that respondent is "dependable and organized" and is "kind thoughtful, and loyal." She describes respondent's criminal conduct as "totally out of character" and unlikely to be repeated. The final letter, from a former client, describes respondent as "intelligent and honest," as well as "honorable and trustworthy."

**{¶ 22}** Although these witnesses and character letters paint the picture of an honest and trustworthy man, they are few in number and come mainly from personal friends. While this evidence has some value in mitigation, it carries little weight in light of the facts and the aggravating factors present in this case.

**Effort to Rectify Consequences and Make Restitution**

{¶ 23} In support of his claim that he has made a timely good-faith effort to both rectify the consequences of his misconduct and make restitution to his victims, respondent cites (1) his cooperation with federal authorities in the investigation and prosecution of his coconspirators, (2) the placement of his attorney registration on inactive status almost two years before his criminal-sentencing hearing, and (3) his ongoing payment of 10 percent of his gross earnings toward his court-ordered restitution, see BCGD Proc.Reg. 10(B)(2)(c). Respondent's arguments, however, present only half the picture.

{¶ 24} As the panel and board found, respondent's cooperation with federal authorities did not begin with his departure from the criminal enterprise, but arose only after several years had passed and federal agents questioned him about his involvement in the conspiracy.

{¶ 25} We acknowledge that when respondent's criminal sentencing was delayed for almost two years (apparently to ensure that he fully complied with the terms of the plea agreement regarding cooperation in the investigation and prosecution of his coconspirators), he placed his license on inactive status. Respondent testified that he did so "voluntarily" based upon his understanding that once a guilty plea had been entered in a criminal case, it was considered a conviction and that he would no longer be permitted to practice law. Thus, he believed that he would not be permitted to practice law. Moreover, relator advised him that if he failed to change his registration status, it would move the court for an interim suspension. Thus, it is not clear from the record that respondent's break from the active practice of law was entirely voluntary.

{¶ 26} Respondent's reliance upon his payment of 10 percent of his gross income toward his restitution order is likewise unavailing. Assuming that he continues to earn $60,000 per year — the maximum salary he earned as a "claims adjuster" — it would take him more than 616 years to pay the $3.7 million restitution order in full. We further reject respondent's attempts to minimize the

extent of the harm caused by his misconduct. While he now argues that the record contains no evidence that any member had a claim that went unpaid, he stipulated that the members who joined the associations based upon the false promises of errors-and-omissions insurance paid dues and fees totaling $3.7 million during his participation in the criminal enterprise. He also testified that "for a fee [the associations] offered a basket of services, but really the main reason that people joined was for the malpractice insurance." Thus, we find no injustice in the measurement of the damages caused by his misconduct.

### Absence of Selfish Motive

{¶ 27} Next, respondent argues that his continued participation in the conspiracy was not motivated by monetary gain, but by concern for the victims. See BCGD Proc.Reg. 10(B)(2)(b). This claim, however, rings hollow because the conspiracy did not terminate with respondent's departure. Respondent's failure to timely notify authorities permitted the conspiracy to continue for several years beyond his departure, creating the risk that even more people would be financially harmed. If he was truly concerned about injury to others, he should have taken steps to ensure that no one else was harmed by the fraud. Instead, he did nothing until federal authorities contacted him.

### Asserted Weakness of Aggravating Factor

{¶ 28} In addition to his claims that the board ignored certain mitigating factors, respondent argues that his prior disciplinary record should not weigh heavily against him, because it involved only a public reprimand.

{¶ 29} Gov.Bar R. V(6)(C) provides, "Prior disciplinary offenses shall be considered as a factor that may justify an increase in the degree of discipline to be imposed for subsequent misconduct." See also BCGD Proc.Reg. 10(B)(1)(a). Thus, the mere existence of a prior disciplinary offense, regardless of the degree of the offense or sanction, is relevant in determining a respondent's likelihood of committing future misconduct. A respondent's commission of multiple offenses

resulting in disciplinary action may demonstrate that the respondent's conduct is recurring, rather than an isolated event, and that therefore his practicing law poses a greater risk to the public. In this case, we hold that respondent's prior disciplinary offense does weigh in favor of a more severe sanction.

### Sanction Imposed in Similar Cases

{¶ 30} Respondent contends, once again, that the facts of this case are similar to those of *Margolis* and *Blaszak*, in which we imposed two-year suspensions and even credited Blaszak for time served under his interim suspension. Those cases, however, are distinguishable from the case at bar.

{¶ 31} While *Margolis* involved a six-year conspiracy of noncompetitive bidding and pricing practices that stifled competition in the scrap-metal industry, the respondent in that case did not have a prior disciplinary record. *Margolis*, 114 Ohio St.3d 165, 2007-Ohio-3607, 870 N.E.2d 1158, at ¶ 4, 14. Margolis had already paid a fine and special assessment totaling $700,200 when we imposed his sanction. Id. at ¶ 6, 14. He had also submitted 92 letters from family, friends, employees, business associates, and other lawyers to demonstrate his good character and reputation. Id. at ¶ 14-15. In contrast, Ritson has a prior disciplinary record, has no realistic expectation of paying his court-ordered restitution in full, and has submitted character evidence from only eight people, most of whom are close friends.

{¶ 32} Because *Blaszak* involved an isolated instance of misconduct during a legal career spanning more than 30 years, it too is distinguishable. *Blaszak*, 104 Ohio St.3d 330, 2004-Ohio-6593, 819 N.E.2d 689, ¶ 12, 21-22. Furthermore, in *Blaszak*, we found that the respondent had submitted "overwhelming evidence of mitigation," consisting of approximately 90 letters from at least eight judges and numerous attorneys, public officials, former clients, and friends, "confirming his good character and integrity apart from the

underlying events," and describing his volunteer work and civic involvement. Id. at ¶ 12-14, 24.

**{¶ 33}** As the board found, the facts of *Ulinski*, 106 Ohio St.3d 53, 2005-Ohio-3673, 831 N.E.2d 425, bear a striking resemblance to the facts of this case. For four years, Ulinski participated in a conspiracy that induced people to invest approximately $41 million in a Ponzi scheme. Like respondent, Ulinski cooperated with the relator and with federal authorities, complied with the terms of his probation and interim suspension, reported his felony conviction to this court and stopped practicing law before we imposed his interim suspension, and, at the time we imposed his sanction, had begun to pay 10 percent of his gross salary toward his court-ordered restitution. Id. at ¶ 14.

**{¶ 34}** Although Ritson's misconduct did not involve the use of his law license, lies to a tribunal, or harm to clients, as Ulinski's misconduct did, it nonetheless caused harm to approximately 3,000 victims and resulted in a restitution order totaling $3.7 million. In contrast, Ulinski was ordered to pay only $137,511.50 in restitution to his victims. And despite the board's favorable impression of Ulinski's testimony, his remorse for his misconduct, and the "many letters extolling [his] competence and character apart from his involvement [in the conspiracy]," demonstrating that he was "known in the legal community for his honesty, conscientiousness, and genuine concern for his clients," we permanently disbarred him. Id. at ¶ 16, 24.

**{¶ 35}** We also permanently disbarred an attorney convicted of federal tax crimes for her failure to file federal, state, and municipal income taxes for over 20 years, finding that her conduct violated DR 1-102(A)(4) and (6). *Dayton Bar Assn. v. Schram*, 122 Ohio St.3d 8, 2009-Ohio-1931, 907 N.E.2d 311, ¶ 2-3. In imposing the ultimate sanction of disbarment, we noted (1) the lengthy period of Schram's tax evasion, (2) her prior misconduct, see *Dayton Bar Assn. v. Schram*, 98 Ohio St.3d 512, 2003-Ohio-2063, 787 N.E.2d 1184 (public reprimand for

collecting a nonrefundable legal fee in a divorce case), and (3) the fact that approximately $200,000 of her criminal restitution order remained unpaid.

### Conclusion

{¶ 36} Having reviewed respondent's conduct and weighed the aggravating and mitigating factors and having considered the sanctions imposed for comparable conduct, we overrule respondent's objection to the board's report, adopt the board's findings of fact and misconduct, and agree that the proper sanction is permanent disbarment. Accordingly, Douglas J. Ritson is permanently disbarred from the practice of law in the state of Ohio. Costs are taxed to respondent.

Judgment accordingly.

LUNDBERG STRATTON, O'CONNOR, O'DONNELL, LANZINGER, and CUPP, JJ., concur.

BROWN, C.J., and PFEIFER, J., dissent.

_____

**BROWN, C.J., dissenting.**

{¶ 37} I disagree with the sanction imposed by the majority. I would impose the sanction originally requested by the bar association and recommended by the panel. Accordingly, I would indefinitely suspend respondent from the practice of law without crediting him with time served under the interim felony suspension. Therefore, I respectfully dissent.

PFEIFER, J., concurs in the foregoing opinion.

_____

Jonathan B. Cherry, Bar Counsel, Michael A. Bonfiglio, and Arnold N. Gottlieb, for relator.

Bradley J. Jan, for respondent.

_____