CLEVELAND BAR ASSOCIATION *v.* DADISMAN.

[Cite as *Cleveland Bar Assn. v. Dadisman,*
109 Ohio St.3d 82, 2006-Ohio-1929.]

(No. 2005–1615—Submitted December 13, 2005—Decided May 3, 2006.)

**Per Curiam.**

{¶ 1} Respondent, Michael F. Dadisman of Independence, Ohio, Attorney Registration No. 0040997, was admitted to the Ohio bar in 1988. On January 28, 2004, we imposed an interim suspension of his license to practice law under Gov.Bar R. V(5a) after we received credible evidence that his continued practice posed a substantial threat of serious harm to the public. *Cleveland Bar Assn. v.*

*Dadisman,* 101 Ohio St.3d 1444, 2004-Ohio-322, 802 N.E.2d 676. On July 12, 2004, we imposed another interim suspension of his license to practice law under Gov.Bar R. V(5) after we received notice that he had been convicted of a felony offense. *In re Dadisman,* 102 Ohio St.3d 1523, 2004-Ohio-3641, 811 N.E.2d 1144.

{¶ 2} On September 17, 2003, relator, Cleveland Bar Association, filed an amended complaint charging respondent with multiple violations of the Code of Professional Responsibility. Respondent filed an answer to the complaint, and a panel of the Board of Commissioners on Grievances and Discipline held a hearing on the complaint in April 2005. The panel then prepared written findings of fact, conclusions of law, and a recommendation, all of which the board adopted.

## Misconduct

### Count I

{¶ 3} In July 1999, Robert Rose Jr. hired respondent to represent Rose and his ex-wife in a bankruptcy matter. Rose paid respondent $175 for a court filing fee. More than a year later, however, respondent had not filed any documents with the bankruptcy court on Rose's behalf, and a creditor sued Rose. Respondent promised to take care of the creditor's suit, but he failed to do so. Rose terminated the representation and requested a refund of his $175, but respondent did not return the money for several months.

{¶ 4} The board found that respondent had violated the following Disciplinary Rules: DR 1–102(A)(6) (prohibiting conduct that adversely reflects on a lawyer's fitness to practice law), 2–110(A)(3) (requiring a lawyer to promptly return unearned fees upon withdrawal from employment), 6–101(A)(3) (prohibiting a lawyer from neglecting an entrusted legal matter), 7–101(A)(1) (barring an attorney from intentionally failing to seek the lawful objectives of a client), and 7–101(A)(2) (barring a lawyer from intentionally failing to carry out a contract of employment).

### Count II

{¶ 5} In September 1998, Robert Seaman hired respondent to collect money owed to Seaman by a former business partner. Seaman paid respondent $2,000 in advance for his services. Six months passed before respondent scheduled a meeting with the business partner, but once that meeting was held, respondent negotiated a settlement under which Seaman's former business partner was to promptly pay an agreed amount to Seaman.

{¶ 6} During the next two years, Seaman tried repeatedly to speak with respondent about his efforts to collect under the settlement agreement, but respondent did not return his telephone calls. Seaman never received the money owed to him under the settlement agreement that respondent had negotiated.

{¶ 7} The board found that respondent had violated DR 6–101(A)(3), 7–101(A)(1), and 7–101(A)(2).

### Count III

{¶ 8} After Seaman filed a grievance against respondent, relator sent letters to respondent in February 2002 asking him to reply to the allegations. Respondent failed to do so.

{¶ 9} The board found that respondent had violated Gov.Bar R. V(4)(G) (requiring attorneys to cooperate with and assist in any disciplinary investigation).

### Count IV

{¶ 10} In June 2000, Laura Harants hired respondent to represent her in a personal-injury matter. Respondent negotiated a $13,500 settlement on Harants's behalf, and Fireman's Fund issued a check in that amount to respondent in December 2000. From the settlement proceeds, Harants was to receive $4,453.14, while respondent was to pay Harants's medical bills totaling $4,546.86 and keep $4,500 as his fee.

{¶ 11} For ten months, Harants called respondent repeatedly to inquire about her share of the settlement proceeds. He did not return the calls and failed to pay the amount that she was owed until October 2001. In December 2001, Harants began receiving letters from a collection agency and learned that respondent had not paid all of her medical providers as he had agreed to do. She tried to contact respondent on many occasions by mail and telephone, and she asked for an accounting of the settlement proceeds. Respondent did not reply and did not provide an accounting. Harants was forced to make payments on her own to the two medical providers whose bills respondent had failed to pay from the settlement proceeds.

{¶ 12} The board found that respondent had violated DR 7–101(A)(1), 7–101(A)(2), 9–102(B)(3) (requiring a lawyer to maintain complete records of all client funds and to render appropriate accounts regarding them), and 9–102(B)(4) (requiring prompt payment of the client's funds or other property in the lawyer's possession).

### Count V

{¶ 13} Jeannette Oliver retained respondent to represent her and her daughter in a class action arising out of an explosion in Elyria in 1993. Under the terms of a settlement of the case, Oliver and her daughter were entitled to receive $500 each from the first distribution of the settlement proceeds in May 2002. Respondent received the settlement checks that month, but did not contact Oliver about them.

{¶ 14} Finally, in August 2002, one of respondent's associates brought the checks to Oliver's home so that she and her daughter could endorse them. Oliver was told that respondent would deposit the endorsed checks into his client trust account and then issue new checks from that account promptly. Several weeks passed before respondent told Oliver on September 19, 2002, that she could pick up the new checks at his office. Oliver picked up the checks from respondent, but when she deposited them at her bank, the checks bounced. After making several more attempts to contact respondent, Oliver was able to secure new valid checks from respondent, but not until July 2003.

{¶ 15} The account on which the checks from respondent were drawn was respondent's client trust account. Respondent used the account to pay the operating expenses of his law practice, rather than limiting the account to client funds.

{¶ 16} The board found that respondent had violated DR 1–102(A)(4) (prohibiting conduct involving fraud, deceit, dishonesty, or misrepresentation), 1–102(A)(5) (barring conduct prejudicial to the administration of justice), 9–102(A) (requiring lawyers to maintain client funds in a separate, identifiable bank account), 9–102(B)(1) (requiring prompt notification that an attorney has received the client's funds), 9–102(B)(3), and 9–102(B)(4).

*Count VI*

{¶ 17} In March 2001, Barbara Balog retained respondent to represent her in a probate matter. Balog believed that she was entitled to a share of an estate under a codicil to a will, even though she was aware that the codicil had not been properly executed. Respondent advised Balog that she had a very strong case, and she then paid respondent a $1,500 retainer with the understanding that he would draw from that retainer at the rate of $125 per hour for his services.

{¶ 18} Balog sent respondent a thick packet of documents about the estate in question and then tried to call him on several occasions between April and June 2001. Respondent returned some of the calls but not others, and Balog was left with the impression that he was doing no work on the case.

{¶ 19} On July 5, 2001, Balog sent respondent a letter discharging him and requesting that he return the unearned portion of the retainer she had paid. Respondent did not reply. On July 30, 2001, Balog sent a second letter in which she requested a complete accounting of his services and again sought a refund of any unearned fees. Respondent never replied, never provided an accounting, and never returned any of Balog's retainer.

{¶ 20} Respondent never told Balog that she had little or no chance of success on her claim. When Balog later consulted another attorney, however, that

attorney advised her that she had no legal right to any of the estate's assets, and he told her that no attorney should have suggested otherwise.

{¶ 21} The board found that respondent had violated DR 6–101(A)(1) (prohibiting a lawyer from accepting a case that the lawyer is not competent to handle), 6–101(A)(3), 7–101(A)(2), 9–102(B)(3), and 9–102(B)(4).

### *Count VII*

{¶ 22} After Balog filed a grievance against respondent, Disciplinary Counsel sent letters to respondent in October and December 2001, asking him to reply to the allegations. Respondent replied to one of the letters, but failed to explain what actions he had taken on Balog's behalf or why he had not delivered an accounting of his time to her as she had requested. At his deposition in April 2002, respondent agreed to provide Disciplinary Counsel with records related to the Balog matter, but he never did so.

{¶ 23} The board found that respondent had violated Gov.Bar R. V(4)(G).

### *Count VIII*

{¶ 24} In March 1999, David Watkins, who was the administrator of his late brother's estate, retained respondent to represent the estate in a wrongful-death matter. Respondent advised Watkins and his family to accept an $80,000 settlement, and they agreed to do so. The $80,000 settlement check from Ohio Insurance Guaranty Association was received by respondent in early December 2001, and he deposited the check into his client trust account.

{¶ 25} Respondent was supposed to give approximately $45,000 of the settlement proceeds to Watkins, but failed to do so. Watkins and some of his family members tried to contact respondent about the money starting in late December 2001. Respondent returned some of their calls, and he offered various excuses for his failure to send the money, claiming at one point that the money had been sent but had been lost in the mail. In October 2002, respondent promised Watkins and his family that the money would be sent to them in two days. Respondent made a similar promise in February 2003, but never paid the money. Finally, at a meeting with Watkins and his family in February 2003, respondent said that the money was "gone."

{¶ 26} For these actions, respondent pleaded guilty to a felony theft offense, and he served eight months in prison.

{¶ 27} The board found that respondent had violated DR 1–102(A)(3) (barring illegal conduct involving moral turpitude), 1–102(A)(4), 1–102(A)(5), 7–101(A)(3) (barring conduct that prejudices or damages a client), and 9–102(B)(4).

### Count IX

{¶ 28} After Watkins filed a grievance against respondent, relator sent letters to respondent in February and March 2003 asking him to reply to the allegations. Respondent failed to do so.

{¶ 29} The board found that respondent had violated Gov.Bar R. V(4)(G).

### Count X

{¶ 30} In early 1999, LaTonya Cross hired respondent to represent her in a medical-malpractice matter. During the next two years, Cross called respondent's office approximately once each month to inquire about the status of her case. He rarely returned her calls, but when he did so, he assured her that he was negotiating with the hospital that was alleged to be at fault.

{¶ 31} Cross discharged respondent in 2001 because he appeared to be doing no work on the case. At the same time, she asked him to send her his case file. He failed to do so, later telling her that he had tried to mail the file to her with insufficient postage and that he had tried to hand-deliver it to her but had lost his way in her neighborhood. Respondent never returned the file and did not pursue any legal action on Cross's behalf within the applicable statute-of-limitations period.

{¶ 32} The board found that respondent had violated DR 1–102(A)(4), 6–101(A)(3), 7–101(A)(2), 7–101(A)(3), and 9–102(B)(4).

### Count XI

{¶ 33} After Cross filed a grievance against respondent, relator sent letters to respondent in January and February 2003 asking him to reply to the allegations. Respondent failed to do so.

{¶ 34} The board found that respondent had violated Gov.Bar R. V(4)(G).

### Sanction

{¶ 35} In recommending a sanction for this misconduct, the board considered the aggravating and mitigating factors listed in Section 10 of the Rules and Regulations Governing Procedure on Complaints and Hearings Before the Board of Commissioners on Grievances and Discipline ("BCGD Proc.Reg."). The one mitigating factor identified by the board was respondent's lack of any prior disciplinary violations. BCGD Proc.Reg. 10(B)(2)(a).

{¶ 36} The board noted several aggravating factors: a dishonest or selfish motive on the part of respondent; a pattern of misconduct; multiple offenses; a lack of cooperation in the disciplinary process; the submission of false evidence, false statements, or other deceptive practices during the disciplinary process; the vulnerability of and resulting harm to the victims of the misconduct; and the failure to make restitution. BCGD Proc.Reg. 10(B)(1)(b), (c), (d), (e), (f), (h), and (i).

{¶ 37} Relator recommended that respondent be permanently disbarred. The panel agreed with that recommendation, as did the board. The case is now before us on respondent's objections to the board's recommendation.

{¶ 38} We have reviewed the board's report and have also considered the written and oral arguments presented by the parties in response to that report. We find that respondent violated all of the provisions cited in the board's report, and we also agree that permanent disbarment is the appropriate sanction.

{¶ 39} The attorney disciplinary process in Ohio is designed to "protect clients and the public, to ensure the administration of justice, and to maintain the integrity of the legal profession." *Disciplinary Counsel v. Hunter*, 106 Ohio St.3d 418, 2005-Ohio-5411, 835 N.E.2d 707, ¶ 32. In this case, the multiplicity of offenses, the resulting harm caused to multiple clients, and respondent's lack of cooperation in the disciplinary process all show that he is a danger to the public and is not fit to remain in the legal profession.

{¶ 40} The sole mitigating factor noted by the board—the absence of any prior disciplinary violations by respondent—cannot begin to overcome the evidence in the record of respondent's willingness to repeatedly ignore the inquiries, flout the requests, and neglect the needs of his clients. He kept money that did not belong to him, misled those who trusted him, and gave testimony at his disciplinary hearing that the panel members described as "evasive, dishonest and patently untrue." Persons who act in this way cannot reasonably expect to remain part of a profession grounded on loyalty, competence, and candor.

{¶ 41} And respondent's misappropriation of client funds is more than a grievous breach of professional ethics. That misconduct violates basic notions of honesty and integrity, and it endangers public confidence in the legal profession. Disbarment—which we have described as the "presumptive sanction for misappropriation of client funds," *Lorain Cty. Bar Assn. v. Fernandez*, 99 Ohio St.3d 426, 2003-Ohio-4078, 793 N.E.2d 434, ¶ 9—is an appropriate sanction in this case to protect the public and to deter other attorneys from engaging in similar actions. Certainly in other cases we have disbarred attorneys who, like respondent, have committed violations of DR 1–102(A) and have been convicted of felony offenses. See, e.g., *Disciplinary Counsel v. Stern*, 106 Ohio St.3d 266, 2005-Ohio-4804, 834 N.E.2d 351; *Disciplinary Counsel v. Ulinski*, 106 Ohio St.3d 53, 2005-Ohio-3673, 831 N.E.2d 425; *Disciplinary Counsel v. Bein*, 105 Ohio St.3d 62, 2004-Ohio-7012, 822 N.E.2d 358.

{¶ 42} Accordingly, respondent is hereby permanently disbarred from the practice of law in Ohio. Costs are taxed to respondent.

Judgment accordingly.

MOYER, C.J., RESNICK, PFEIFER, LUNDBERG STRATTON, O'CONNOR, O'DONNELL and LANZINGER, JJ., concur.

Ian N. Friedman & Associates, L.L.C., Ian N. Friedman, Ronald L. Frey, and Erik S. Dunbar, for relator.

Lester S. Potash, for respondent.