CLEVELAND METROPOLITAN BAR ASSOCIATION *v.* TOOHIG.

[Cite as *Cleveland Metro. Bar Assn. v. Toohig,*

133 Ohio St.3d 548, 2012-Ohio-5202.]

*Attorneys—Misconduct—Multiple violations of the Rules of Professional Conduct, including charging excessive fees, dishonesty, and client-trust-account improprieties and dishonesty—Felony conviction of income-tax evasion—Permanent disbarment.*

(No. 2011-2037—Submitted March 20, 2012—Decided November 15, 2012.)

ON CERTIFIED REPORT by the Board of Commissioners on Grievances and Discipline of the Supreme Court, No. 10-072.

_____

**Per Curiam.**

**{¶ 1}** On August 16, 2010, the relator, Cleveland Metropolitan Bar Association, filed a three-count complaint against Kevin Thomas Toohig, Attorney Registration No. 0067447, last known address in Chagrin Falls, Ohio, for violating the Rules of Professional Conduct. On January 7, 2011, we issued an order noting that a copy of a judgment entry of Toohig's felony conviction had been certified to the court, and we ordered Toohig's suspension for an interim period. 127 Ohio St.3d 1496, 2011-Ohio-18, 939 N.E.2d 865.

**{¶ 2}** Relator amended the complaint twice. The second amended complaint consisted of six counts charging Toohig with 22 violations of the Rules of Professional Conduct. A panel of the Board of Commissioners on Grievance and Discipline found, and the board concurred in finding, 16 rule violations, including four violations involving dishonesty, fraud, deceit, or misrepresentation and two involving an illegal act that reflects adversely on the attorney's trustworthiness or honesty.

**{¶ 3}** Those violations relate to Toohig's (1) federal conviction for income tax evasion, (2) repeatedly misusing client funds held in a client trust account, including transferring funds to a corporate account he used for personal purposes to evade creditors, (3) transferring money by wire to his trust account and immediately withdrawing a fee during a criminal investigation of a person with whom he had no clear attorney-client relationship, and (4) failing to remit settlement money to his clients from the trust account. After weighing the aggravating and mitigating factors, the panel recommended disbarment. The board adopted that recommendation, and we concur. We therefore order that Toohig be disbarred.

### Respondent's objection to the second amended complaint is rejected

**{¶ 4}** We first address Toohig's objection to the board's decision to use the second amended complaint as the basis for its proceedings. Toohig lodged a twofold objection at the hearing: he maintained that he had not received a certified-mail copy of the second amended complaint at a current address and additionally asserted that the consideration of the second amended complaint was improper because the panel and the board did not formally enter an order granting leave to file. In the written objections to the board report, Toohig argues that standards under the Ohio Civil Rules, specifically Civ.R. 15(A), should apply in this proceeding. Although Toohig admits that the panel chair informally agreed over the telephone to consider relator's filing of a second amended complaint, he asserts that relator had permission only to file for leave to file an amended complaint and that relator filed a day late in any event. Also, Toohig maintains that relator should have filed a motion for default when Toohig did not file an answer to the second amended complaint.

**{¶ 5}** Pursuant to Gov.Bar R. V(11)(A)(1), the board "shall follow the Ohio Rules of Civil Procedure and the Ohio Rules of Evidence wherever practicable unless a specific provision of this rule or Board hearing procedures

and guidelines provides otherwise." Relator in this case did file a motion for leave to file the second amended complaint on March 28, 2011. That motion states that Toohig "has no objection and consents to this motion," and Toohig points to no evidence that that statement is inaccurate.

{¶ 6} The motion for leave furnished information regarding the discovery of additional evidence of violations of the Rules of Professional Conduct and indicated that the evidence was both newly discovered and could not reasonably have been discovered earlier. Moreover, the second amended complaint was attached to the motion.

{¶ 7} On March 31, 2011, the board entered an order permitting the filing of the second amended complaint on or before May 1, 2011, and rescheduled the hearing from April to August 2011. The record does reflect the filing of the second amended complaint on May 2 rather than May 1, but it is significant that the document was already before the board—and had already been served on respondent—as an attachment to the motion for leave. Next, on May 5, 2011, a formal entry noted the filing of the second amended complaint and ordered that the filing be accepted and be served by certified mail on respondent.

{¶ 8} Under these circumstances, the case law indicates that the board acted properly by accepting the second amended complaint—indeed, failure to do so might even have constituted an abuse of discretion. *See Peterson v. Teodosio*, 34 Ohio St.2d 161, 297 N.E.2d 113 (1973), paragraph six of the syllabus ("It is an abuse of discretion for a court to deny a motion, timely filed, seeking leave to file an amended complaint, where it is possible that plaintiff may state a claim upon which relief may be granted and no reason otherwise justifying denial of the motion is disclosed"); *Hambleton v. R.G. Barry Corp.*, 12 Ohio St.3d 179, 183-184, 465 N.E.2d 1298 (1984). Toohig additionally chides relator for not filing a motion for default, but that point is entirely moot because Toohig received the full benefit of an adversarial evidentiary hearing at which he had the opportunity to,

and in fact did, cross-examine relator's witnesses, present witnesses of his own, and offer exhibits.

{¶ 9} With respect to the issue of service of the second amended complaint, the panel and the board made specific findings in support of using the second amended complaint. First, the new complaint was mailed to the last known address—and any confusion about the proper address appears to result from Toohig's failure to keep the board apprised of his current address, as he was required to do pursuant to the January 2011 order of this court. Second, Toohig acknowledged at the hearing that he had received a copy of the second amended complaint.

{¶ 10} We concur with the board that under the circumstances of this case, these findings justify proceeding on the second amended complaint.

**Misconduct**

{¶ 11} At the time of the hearing on August 8 and 9, 2011, Toohig was a 42-year-old graduate of the University of Akron Law School who had been admitted to the practice of law in Ohio in 1996. He was married, with three children under the age of five.

*1. Count One: Mishandling of Fees—The Rudolph Grievance*

{¶ 12} The first count charges Toohig with the improper retention and use of fee payments in a criminal case.

{¶ 13} In 2007, Toohig met with Dan Rudolph, the brother-in-law of a man charged with sex offenses. Toohig executed a fee agreement with Rudolph to provide legal services to the brother-in-law, and pursuant to that agreement, Toohig accepted from Rudolph an initial fee of $5,000, designated by the contract as a "nonrefundable" retainer. In December 2007, Toohig decided that the case was beyond his expertise and that the services of a criminal-defense specialist were needed, so he referred the client to Ian Friedman, a Cleveland criminal-defense lawyer.

{¶ 14} At a meeting at which Rudolph, Friedman, and Toohig were present, it was agreed that Rudolph would advance $29,000 to Toohig which, together with the original $5,000, would be used to pay for services rendered by Toohig and Friedman, with Toohig holding the money and making payments to Friedman on Rudoph's behalf as necessary. Rudolph wrote the check to Toohig, who deposited it in his client trust account and shortly thereafter transmitted $20,000 of the money to Friedman. The understanding was that further fees incurred by Friedman's representation would be paid for out of the retainer money held by Toohig.

{¶ 15} After sentencing in the criminal case, Rudolph received an invoice from Friedman dated August 6, 2008, billing $5,900.71 as the amount owed in relation to the representation. Rudolph then requested that Toohig transmit the $5,900 to Friedman. Of the $34,000 of retainer money Rudolph had tendered to Toohig, that would leave $8,099.29, which Rudolph authorized Toohig to keep as his own fee. On September 7, 2008, Toohig communicated to Rudolph that the transfer of funds "was handled with Ian's office."

{¶ 16} Friedman's office transmitted an overdue-balance invoice for the $5,900.71 on January 12, 2009, and Rudolph attempted to contact Toohig without success. On February 12, 2009, Friedman wrote Rudolph indicating that the $5,900 had not been remitted by Toohig. By the time Rudolph was demanding that Toohig pay Friedman, Toohig had taken the balance of the retainer money out of the client trust account.

{¶ 17} Ultimately, Toohig did not remit the entirety of Friedman's fee until October 21, 2009, almost 15 months after Friedman submitted the bill to Rudolph and Rudolph submitted the invoice to Toohig.

{¶ 18} Toohig did prepare a statement of the time that Toohig himself had spent defending the criminal case. The statement included five jail visits that were not reflected on visitation records of the jail. The original fee agreement set

forth an hourly rate for Toohig of $200, and the statement of hours enumerated 38.75 hours spent by Toohig on the criminal case. Once the five nonexistent jail-visit hours are subtracted, Toohig spent 33.75 hours on the case, for which he received $8,099.29. That indicates a rate of $240 per hour.

{¶ 19} In connection with the Rudolph grievance, the second amended complaint charged that respondent improperly withdrew money from a trust account in violation of Prof.Cond.R. 1.15(c) (a lawyer shall deposit fees and expenses paid in advance into a trust account, to be withdrawn by the lawyer only as fees are earned or expenses incurred). The complaint also charged a violation of Prof.Cond.R. 1.5(a) (a lawyer shall not charge an illegal or clearly excessive fee), 1.5(d)(3) (a lawyer shall not enter into a fee agreement for a fee denominated "nonrefundable" without a written statement that the client may be entitled to a refund of all or part of the fee based on the value of the representation), and 8.4(c) (a lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation). The panel and board found by clear and convincing evidence a violation of Prof.Cond.R. 1.15(c) and 1.5(d)(3), but found that violations of Prof.Cond.R. 1.5(a) and 8.4(c) had not been proved. We concur.

*2. Count Two: The Randell Incident in Colorado*

{¶ 20} Toohig was charged with misconduct in connection with representing Hysear Randell, a Colorado promoter who was subsequently convicted of 52 counts in connection with the theft of almost $11 million from the Colorado Department of Revenue and was sentenced to 58 years in prison. Toohig met Randell in 2006 and maintained a social relationship during which he sought opportunities to represent Randell. In late April 2007, Toohig received a call from Randell's wife, who stated that "a whole lot of people with a search warrant" were raiding her house in Colorado.

{¶ 21} After receiving an additional call in which Randell's wife indicated that Randell wanted to see Toohig, Toohig flew to Denver, where he met with

Randell, who was being sought in connection with theft and was evading arrest. Randell wanted Toohig to find lawyers to represent him. After two consultations, Toohig agreed to Randell's suggestion that Toohig wire money from Randell's account into Toohig's trust account in Ohio. On April 30, 2007, $710,098.39 was wired from a brokerage account in Randell's name to Toohig's client trust account. By check of the same date, Toohig transferred $50,000, with the notation "partial Randell fees," from the trust account to his law office account.

{¶ 22} On May 1, Toohig was heading for the airport to fly back to Ohio when he received a phone call from law enforcement telling him to remain in Colorado. Toohig communicated with Randell, and the two met. Law enforcement then arrested Randell and Toohig. Pursuant to actions of the Colorado prosecutor, the full $710,098.39 wired to Ohio was ultimately frozen and recovered in conjunction with the criminal investigation and prosecution of Randell and his accomplice.

{¶ 23} In connection with the Randell incident, the complaint charged violations of Prof.Cond.R. 1.5(a), 1.15(c), 8.4(c), and 8.4(d) (a lawyer shall not engage in conduct that is prejudicial to the administration of justice). Although the second amended complaint alleged that Toohig had charged an excessive fee, no finding was made on that claim. Other than the excessive-fee claim, the panel and board found violations with respect to all the charges, and we concur.

*3. Count Three: Conviction for Tax Evasion*

{¶ 24} On May 21, 2010, a criminal complaint was filed in the United States District Court for the Northern District of Ohio, case No. 1:10-DR-0231, that alleged that Toohig had engaged in tax evasion with respect to $184,964 owed for tax year 2000. On June 22, 2010, Toohig entered into a plea agreement under which he agreed to enter a guilty plea to one charge of attempting to evade or defeat the payment of income tax in violation of 26 U.S.C. 7201.

**{¶ 25}** The elements to which Toohig pleaded guilty were (1) that he had substantial income tax due and owing for the year charged, (2) that he made an affirmative attempt to evade or defeat the payment of the tax due and owing, and (3) that he acted willfully, i.e. voluntarily, with the specific intent to violate a known legal duty to pay tax. Toohig specifically stipulated that he "did willfully attempt to evade and defeat payment of his income tax due and owing for the calendar year 2000 in the approximate amount of $184,964.00," and that he did so by "[c]oncealing the true profit of his law practice by paying substantial personal expenses through it and falsely claiming them as legitimate business expenses," by "[s]tructuring deposits to and withdrawals from both business and personal bank accounts to avoid currency reporting requirements," by "[w]ithdrawing currency extensively from bank accounts to conceal large personal expenditures," and by "[p]roviding false financial information to the Internal Revenue Service on or about October 13, 2004, in conjunction with [his] attempt to settle this debt." The court convicted Toohig of the offense and sentenced him to four years' probation that included provisions requiring Toohig to participate in an approved program for substance abuse.

**{¶ 26}** With respect to the tax-evasion conviction, the complaint charged violations of Prof.Cond.R. 8.4(b) (a lawyer shall not commit an illegal act that reflects adversely on the lawyer's honesty or trustworthiness), 8.4(c), and 8.4(h) (a lawyer shall not engage in conduct that adversely reflects on the lawyer's fitness to practice law). The panel and the board concluded that clear and convincing evidence proved that Toohig had violated all three provisions in conjunction with his conviction for federal tax evasion. We concur in that conclusion.

*4. Count Four: Misconduct in the Settlement of the Kazen Case*

**{¶ 27}** On October 24, 2007, Shana Kazen engaged Toohig to represent her in connection with an automobile accident that had occurred in October 2006.

8

She executed a limited power of attorney authorizing Toohig's firm to "endorse on [her] behalf any document or any Settlement Draft or Release from any insurance company representing settlement of [her] personal injury claim."

{¶ 28} Toohig initiated a lawsuit on Kazen's behalf that led to a settlement of $9,100. Attorney Stephen Proe represented the defendant in that case, and on or about June 7, 2010, Proe mailed to Toohig a settlement draft payable to Kazen and Toohig's firm in the amount of $9,100. Transmitted to Toohig with the draft was a release and a cover letter that asked that Toohig have the release executed and returned to Proe's office. The letter further stated, "Of course, it is understood that the draft will not be negotiated until you are in a position to return the executed release to me."

{¶ 29} Toohig deposited the $9,100 in his trust account on June 9, 2010, and withdrew $3,200 that same day with a check payable to the law firm for "Shana Kazen Fees and Exp." On July 1, 2010, Proe sent a letter to Toohig by certified mail that recited the facts relating to the settlement and noted that Toohig had negotiated the check but had not returned the signed release. The letter further stated that Kazen had contacted Proe, stating that she had dismissed Toohig and had received no settlement funds.

{¶ 30} During the hearing, Toohig gave differing reasons for why he did not remit the settlement money to Kazen. One version was that Toohig could not locate Kazen. Another reason was that he had an obligation to negotiate and pay doctor bills out of the recovery first (though Toohig offered no evidence that any such bills were in fact negotiated and paid).

{¶ 31} In August 2010, Kazen came to Toohig's office with a police officer to demand that she receive her settlement money. She did not succeed in obtaining the money at that time. Toohig offered additional reasons for why he had not tendered the settlement money owed to Kazen earlier. At the hearing, he testified that his attorney had told him not to give Kazen the money, but he agreed

that at a deposition, he had testified that he tried to give her the money when she came to his office, but "she wouldn't take it." The record shows that there was in fact not enough money in respondent's client trust account at the end of June 2010 to pay Kazen the settlement amount.

{¶ 32} Finally, in November 2010, Toohig remitted the sum of $9,100 to Kazen from the trust account. But he did so only after relator had filed the initial complaint and he had been placed on probation in the federal tax case.

{¶ 33} With respect to the Kazen matter, the second amended complaint charged violations of Prof.Cond.R. 1.15(d) (a lawyer "shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive") and 8.4(c). The panel and the board found that Toohig's testimony as to why he did not timely remit the sum to the client was not credible and concluded that clear and convincing evidence proved that Toohig had violated both rules. We concur.

*5. Counts 5 and 6: Multiple Client-Trust-Account Improprieties and the Rolic Matter*

{¶ 34} The complaint alleges several improprieties in the maintenance of Toohig's client trust accounts. The panel and the board found (1) two instances of overdrawn trust accounts, (2) four instances between December 2009 and March 2010 of payments totaling $16,400 out of a client trust account to Equitable Property, Ltd., a corporation wholly owned by Toohig, who admitted the money was for his personal use and that he put it in a corporate account to avoid "sweeps" by his creditors, (3) checks written from the client trust account to Toohig's assistant, Kacie Butcher, for which Toohig offered no satisfactory explanation, (4) one instance in December 2010 in which Toohig paid for a continuing-legal-education course out of the client trust account, (5) one instance in which Toohig wrote a check from his client trust account for attorney fees to obtain legal counsel for the disciplinary proceedings, (6) several instances in

which checks were written from the client trust account to DiCillos, a tavern, in amounts totaling $1,100. In two instances, Toohig engaged in the practice of law after the January 7, 2011 order of the court suspending his license on account of his federal-tax-evasion conviction: first, Toohig filed a complaint on behalf of a client and advanced a filing fee of $435 out of his trust account, after which the check was dishonored on account of insufficient funds, and second, Toohig issued a check from his law-firm account to a court clerk in the amount of $220 with a memo line noting "J. Jackson Complaint," which was then dishonored for lack of funds. In conjunction with the last two items, Toohig was listed as counsel of record after the effective date of his interim suspension.

{¶ 35} The panel and the board additionally found, based on the documents and testimony, that "[d]uring all times relevant to this matter, [Toohig] did not maintain records for funds received, disbursements made, or return monthly reconciliation of his Liberty and PNC IOLTA accounts."

{¶ 36} With respect to the Rolic matter, Toohig represented Rolic in connection with a mediation concerning distribution of the proceeds of a wrongful-death judgment (Toohig had no involvement in the underlying litigation). As a result of the mediation, Rolic was to receive $275,790. At Rolic's request, Toohig held the proceeds in his client trust account so that Rolic would not spend the money foolishly. From March 10, 2010, through December 9, 2010, Rolic received 18 checks from the trust account, totaling $222,400. There were no further payments. If Toohig's 10 percent fee is presumed valid, Toohig owed Rolic $25,811. Bank records show that the balance in the trust account was insufficient to pay Rolic what he was owed. Among other things, the failure to repay Rolic violated the court's order suspending Toohig's law license; the order specifically required Toohig to "account for any trust money or property in Respondent's possession or control."

{¶ 37} The panel and the board concluded, on the basis of the foregoing findings, that Toohig had violated Prof.Cond.R. 1.15(a)(2) (a lawyer shall maintain a record for each client on whose behalf funds are held), 1.15(a)(5) (a lawyer shall perform and retain a monthly reconciliation of the records of client funds), 1.15(d) (a lawyer shall promptly notify the client or third persons upon receiving funds or other property in which a client or third person has an interest), 8.4(b), and 8.4(c). We concur.

### Aggravation and mitigation

#### 1. Aggravating Factors

{¶ 38} The present case is replete with aggravating factors pursuant to BCGD Proc.Reg. 10(B)(1).

{¶ 39} First, numerous violations found by the panel and the board involve a dishonest or selfish motive. *See* BCGD Proc.Reg. 10(B)(1)(b). Specifically, the federal-tax-evasion plea and conviction involve Toohig's admitting the willful submission of false information in order to enjoy the personal benefit of paying lower taxes. Additionally, the Randell incident in Colorado involved conspiring with a fugitive to wire a substantial sum into Toohig's client trust account, after which Toohig immediately paid himself $50,000 in violation of the requirement that fees be withdrawn only as earned.

{¶ 40} In the Kazen matter, Toohig likewise served his own financial interest by depositing the draft and withdrawing his fee even though he failed to obtain execution of the release and failed to remit settlement money to the client. Only after many months, with a grievance pending and a visit by the client with police, did Toohig pay the client what was owed.

{¶ 41} Second, the violations demonstrate a clear pattern of misconduct. *See* BCGD Proc.Reg. 10(B)(1)(c). In particular, the payment of client-trust-account funds to himself and nonclients, the account overdrafts, and the failure to

maintain required records of funds received and disbursements made are evidence of a systematic failure by Toohig to comply with basic ethical obligations.

{¶ 42} Third, the foregoing discussion of the misconduct plainly establishes multiple offenses over many years. *See* BCGD Proc.Reg. 10(B)(1)(d).

{¶ 43} Fourth, the record demonstrates Toohig's failure to cooperate in the disciplinary process. *See* BCGD Proc.Reg. 10(B)(1)(e). In part because Toohig failed to comply with the January 7, 2011 order that he provide notice of any change of address, service of documents on Toohig failed several times. Relator requested production of documents but *no documents were ever produced* despite orders compelling production and imposing sanctions. Moreover, Toohig filed at least two complaints in court after he had been suspended from the practice of law, and he failed to make refunds of unearned fees or expenses and failed to account for trust money in his control in violation of the January 7, 2011 order.

{¶ 44} Fifth, harm did result to Toohig's clients, and full restitution was not made. *See* BCGD Proc.Reg. 10(B)(1)(h) and (i). Specifically, Kazen suffered a substantial delay in obtaining settlement money owed to her. Rolic, after entrusting the proceeds of a wrongful-death judgment to Toohig, obtained some but not all of the money from Toohig. As of the time of the hearing, Toohig had still not paid at least $25,811 owed to Rolic.

### 2. Mitigating Factors

{¶ 45} In mitigation is the absence of a prior disciplinary record and testimony regarding Toohig's alcoholism. *See* BCGD Proc.Reg. 10(B)(2)(a) and (g).

{¶ 46} We confront a substantial dispute concerning the proper consideration of Toohig's alcohol abuse. The panel and the board found that the testimony of the witness from the Ohio Lawyers Assistance Program ("OLAP") satisfied, at least superficially, the requirements necessary to consider alcoholism

a mitigating factor. But the panel and the board concluded that the opinions expressed were derived more from Toohig's narrative than the witness's awareness of all the specifics of the misconduct.

{¶ 47} The witness from OLAP made the blanket assertion that Toohig's misconduct could be attributed to alcoholism despite the witness's lack of knowledge of the specifics and the timing of Toohig's misconduct. The panel and the board found it significant that the tax evasion occurred almost nine years before the witness met Toohig and that the witness had no direct source of information regarding the connection between alcoholism and the tax evasion apart from Toohig's own narrative. Under these circumstances, the panel and the board accorded little weight to alcoholism as a mitigating factor.

{¶ 48} Toohig also presented a written report from Lee J. Horowitz, Ph.D., that was addressed to the panel and that purported to make a psychological diagnosis of Toohig. Because relator had no prior knowledge of the report and because Dr. Horowitz did not appear as a witness and could not be cross-examined, the panel and the board declined to consider his report.

{¶ 49} Toohig objects to the lack of credence accorded to the testimony of the witness, and he asserts that the psychologist's report ought to have been considered. Our review of the record leads us to reject Toohig's objections and to uphold the report of the board.

{¶ 50} At the outset, we note that in order to constitute a mitigating factor, a chemical dependency must meet four criteria, including diagnosis and a determination that the dependency "contributed to cause the misconduct." BCGD Proc.Reg. 10(B)(2)(g)(i) and (ii). Toohig attempted to establish this through a combination of the testimony of the witness from OLAP, who is a licensed chemical-dependency counselor, and a written report of a psychologist who did not testify. Under these circumstances, the board was justified in viewing the

"contributing cause" element as not being sufficiently established by the record. That is so for three reasons.

{¶ 51} First and foremost, the board was fully justified in declining to consider a psychological report when the author did not testify. Basic evidentiary principles call for the author's testimony to avoid authenticity and hearsay problems generally and to accord relator the opportunity to cross-examine and thereby call the professional pronouncements into question.

{¶ 52} Second, the board's comments concerning the testimony of the witness are not without merit. The witness, who first became acquainted with Toohig in October or November 2009, based his testimony on (1) Dr. Horowitz's report, which was properly not considered by the board, (2) the witness's interviews with Toohig, and (3) the witness's observing Toohig's progress and change. The witness stated that other than Dr. Horowitz's report, he had not consulted collateral sources, but he pointed out that it is the practice to do so only when chemical dependency is being denied, not when it is being admitted. And the witness did not know the specifics surrounding the tax evasion that had occurred several years previously.

{¶ 53} Third, relator correctly points out that much of the charged misconduct occurred after Toohig's period of sobriety commenced in November 2009. Specifically, the failure to remit settlement money to his client Kazen occurred in the summer and fall of 2010, and the numerous client-trust-account violations in counts five and six of the complaint occurred in late 2009 and into 2010.

{¶ 54} Under all these circumstances, the board was justified in not regarding Toohig's alcoholism as a significant mitigating factor, and we concur in that conclusion.

**Disposition**

**{¶ 55}** Broadly speaking, this case presents two strands of misconduct: a guilty plea and conviction of federal-income-tax evasion and a pattern of abusing the client trust account for personal purposes accompanied by a callous failure to account for those funds overall.

**{¶ 56}** The presumptive sanction for misappropriation of client funds is disbarment. *Cleveland Bar Assn. v. Dixon*, 95 Ohio St.3d 490, 2002-Ohio-2490, 769 N.E.2d 816, ¶ 15. Although the presence of sufficient mitigating factors justifies consideration of a lesser sanction, we do not confront such circumstances in this case. We have concluded that the attempt to attribute Toohig's actions to alcoholism is not credible on this record, and that is particularly true of many of the trust-account violations, which occurred after the alleged date of sobriety.

**{¶ 57}** In the context of a conviction for federal tax evasion, we have sometimes imposed a sanction less than disbarment. *See Disciplinary Counsel v. Smith*, 128 Ohio St.3d 390, 2011-Ohio-957, 944 N.E.2d 1166 (indefinite suspension for tax evasion); *Disciplinary Counsel v. Petroff*, 85 Ohio St.3d 396, 709 N.E.2d 111 (1999) (one-year suspension with credit for time served). However, *Smith* involved "full and free disclosure to Disciplinary Counsel and cooperative attitude toward these proceedings," *Smith* at ¶ 11, mitigating factors that are not present in this case. Nor did *Smith* involve the numerous trust-account violations presented here. In *Petroff*, the respondent "cooperated fully with relator's investigation" and "none of his conduct had any impact on his clients and did not arise from the representation of his clients." *Petroff* at 396. The same cannot be said for the trust-account violations in the present case.

**{¶ 58}** Ultimately, the disposition of this case should be commensurate with the multiple instances of dishonesty and misappropriation that we confront. Analogous cases are *Cincinnati Bar Assn. v. Weaver*, 102 Ohio St.3d 264, 2004-Ohio-2683, 809 N.E.2d 1113; *Cleveland Bar Assn. v. Dadisman*, 109 Ohio St.3d

82, 2006-Ohio-1929, 846 N.E.2d 26; and *Toledo Bar Assn. v. Mason*, 118 Ohio St.3d 412, 2008-Ohio-2704, 889 N.E.2d 539. These cases involve acceptance and retention of client fees and settlement funds, accompanied by neglect of client matters or failure to remit monies properly. There, as here, the violations involve client harm and willful disregard of legitimate client interests. Also pertinent is *Cincinnati Bar Assn. v. Farrell*, 129 Ohio St.3d 223, 2011-Ohio-2879, 951 N.E.2d 390, which involved an egregious instance of fraud on a court coupled with failure to file returns and pay taxes. All these cases resulted in disbarment, and the same result is warranted here.

### Conclusion

{¶ 59} For all the foregoing reasons, we adopt the findings and conclusions of the board, and we concur in the recommended sanction of disbarment. Respondent is therefore permanently disbarred from the practice of law in Ohio. Costs are taxed to respondent.

Judgment accordingly.

O'CONNOR, C.J., and PFEIFER, LUNDBERG STRATTON, O'DONNELL, LANZINGER, CUPP, and MCGEE BROWN, JJ., concur.

_____

McDonald Hopkins, L.L.C., R. Jeffrey Pollock, and Erin K. Walsh, for relator.

Kevin T. Toohig, pro se.

_____